IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

THE UNITED STATES OF AMERICA

v.  No. 1:16-cr-00065-SM

ROBERT BRUNK

DEFENDANT'S MOTION FOR DEPARTURE AND VARIANCE,
AND SUPPORTING SENTENCING MEMORANDUM

The Defendant, Robert Brunk, through his counsel, respectfully submits this Motion for Departure and/or Variance, and Sentencing Memorandum.[1]

The defense submits that the appropriate sentence in this case is 63 months of incarceration and 10 years of supervised release. The Presentence Investigation Report ("PSR") states a total offense level of 35 for a sentence range of 168 to 210 months. As explained below, the PSR incorrectly applies a 2-level increase. Furthermore, a departure is warranted on the basis of Robert's mental and physical conditions. The defense suggests a combined departure of 7 levels, such that after departure, the offense level is 26, for a sentencing range of 63 to 78 months. The defense requests a sentence of 63 months, at the low end of that range. If the court finds that a variance is necessary to reach that sentence, then the defense requests a variance.

ROBERT BRUNK'S LIFE[2]

Robert's life history – medical, psychological, educational, family, and otherwise – is so unique and so important to this case that it must be discussed in detail. Robert was born 13

---

[1] The defense is filing Sentencing Exhibits A – N. The defense cites the Exhibits and the Presentence Investigation Report are cited in support of this pleading. Exhibits A – H are filed under seal. Exhibits I – N are redacted as required by court rule but are not filed under seal.

[2] The defense notes that 412 pages of records regarding Robert's life history were provided to the experts who wrote Exhibits A and B, to Probation, and to the government. Since those records are summarized in Exhibits A and B, and in the PSR, the records have not been provided to the court as exhibits. However, the records are available and would be provided to the court promptly upon request.

1

weeks prematurely in San Antonio, Texas. He weighed 2.6 pounds. His mother was 17 years old. Texas Department of Protective and Regulatory Services records describe Robert's mother as follows:

> Ms. ----------'s lifestyle is one of dependency on social agencies. She receives AFDC and food stamps for her other four children. She used to live in subsidized housing, but because of possession of marijuana while staying in subsidized housing, she now could no longer be eligible for subsidized housing. Ms. ----------- maintains dependency by living with her boyfriend.

Information about Robert's father is unknown because he was never found by any state agency.

Having been born prematurely and underweight with multiple medical problems, Robert lived the first months of his life in a hospital. He suffered from respiratory distress syndrome, sepsis, jaundice, and necrotizing enterocolitis (tissue death of the bowels). Exhibit A, p. 3. As a result of the respiratory distress syndrome, Robert spent 4 weeks on a ventilator before he could breathe independently. *Id*.

Robert also had multiple surgeries. *Id*. One week after his birth, he underwent removal of a portion of his lower intestine to address the necrotizing enterocolitis. Exhibits G and H. Two weeks later, he had heart surgery – "a left thoracotomy with ligation of the patent ductus arteriosus with a large hemoclip." That surgery was to correct a heart valve that was not closing properly. Two months later, he had further exploratory heart surgery to determine whether the first heart surgery had succeeded.

In addition to the premature birth, the intestinal defects, and the heart defects, Robert was diagnosed with cerebral palsy. Exhibit A, p. 3. Cerebral palsy is "a disability resulting from damage to the brain before, during, or shortly after birth and outwardly manifested by muscular incoordination." Meriam-Webster's Dictionary (2015). During his early childhood, prior to his adoption, Robert had repeated orthopedic surgeries to lessen the effects of his cerebral palsy.

For example, in December of 1993, when he was 3 years old, he had surgery "to lengthen the heel cord and reposition bone in his left foot."

Today, Robert still bears the scars of his multiple childhood surgeries. The scar from his abdominal surgery is shown in Exhibits E and F. Scars on Robert's legs from corrective surgeries aimed at mitigating the effects of the cerebral palsy are shown in Exhibits G and H. Robert has additional scars which were not photographed, such as the scars on his jaw line which are the result of corrective surgery to his jaw bone and to correct a cleft palate.

Not surprisingly, Robert's young, unstable mother could not deal with a child who had his health issues. When Robert reached the age of 7 months, medical examinations resulted in a diagnosis of "failure to thrive." Exhibit A, p. 3. Reports noted that Robert's mother failed to feed him properly and failed to provide consistent medical care. Thereafter, Texas state agencies removed Robert from his mother's care on grounds of medical neglect. *Id*. Robert was placed in foster care where he remained for the next 4 years. *Id*. Ultimately, his mother agreed to termination of her rights and Robert was adopted at age 5. *Id*.

Katie Brunk, Robert's adoptive mother, is from Richmond, New Hampshire. She had fostered other children and, when Robert was 5 years old, she adopted him. Exhibit I. She brought Robert home to New Hampshire and raised him at her home in Richmond with her other foster children. *Id*.; Exhibit M. Robert has never lived anywhere else.

Throughout his childhood, Robert demonstrated a number of developmental delays. In early childhood, the delays included the areas of crawling, walking, self-feeding, toilet training, and language acquisition. Exhibit A, p. 3. A report from just before Robert's fourth birthday in 1994 describes a four-year-old who could not walk, who could not even crawl "normally," who could not chew his own food, and who was not toilet trained:

> Robert is a handicapped child with limited use of his legs…. Robert is quite delayed in most milestones in life.  He has not yet mastered normal crawling.  He prefers to rabbit-hop although at rare moments he will crawl normally, but only for a brief period of time.  He is able to stand up without support, but unable to walk independently…. Robert's self-feeding skills were not learned until about a year ago. He is still quite clumsy and messy.  Robert also has not learned to chew his food properly.  He will need further monitoring in order to assure proper food intake.  Robert also has not mastered toilet training.

After his adoption and relocation to New Hampshire, Robert had more corrective surgeries and on-going treatment of his medical issues at the Concord Clinic for Children with Neuromotor Disabilities.  Exhibit A, p. 3; PSR §60. As he received those services, his physical mobility improved through physical therapy and the use of braces, a walker, and a wheelchair.  *Id*.

Accompanying Robert's physical disabilities were intellectual and psychological disabilities.  Due to the amount of attention he had from state agencies, he was tested on multiple occasions with varying results.  At age 5, he had a psychological evaluation, but his level of distractibility made it difficult for him to complete the tests.  Exhibit A, p. 4.  An educational assessment when he was 8 years old placed him in the very low range for calculation, applied problems, dictation, and writing samples.  He was placed in the low range for passage comprehension, the low average range for humanities and letter-word identification, and the average for science and social science.  A consistent theme in the tests was that "his receptive language skills were significantly better than his expressive language skills."  Exhibit A p. 4, p. 5.  When Robert was in school he had an Individualized Education Program based on his orthopedic impairments and to address the concerns raised by his testing.  Exhibit A, p. 5.

At age 19 Robert had a full intellectual and academic assessment.  Exhibit A, p. 5.  His full scale IQ score was 70, described as the "borderline range."  However, his results were complicated because the full scale score derived from average scores in verbal comprehension, but "extremely low" scores in perceptual reasoning and borderline scores in working memory.

*Id.*  These results were consistent with the earlier reports of good verbal comprehension skills but extremely low abilities in other areas.  The assessment noted that Robert may be frustrated by these inconsistent skill levels because his limited working memory and very limited ability to process visual material makes "the processing of complex information more time-consuming, draining his mental energies more quickly as compared to others at his level of ability…."  *Id.*

Not surprisingly, considering Robert's unique physical and intellectual challenges, Katie Brunk struggled to find the right educational setting for Robert.  She first sent him to public schools, but she was not happy with the school system.  Exhibit I, p. 2.  She felt that the public schools were "just passing him through."  *Id.*  She tried a private school and then a Christian school, before deciding to homeschool Robert for high school.  *Id*; Exhibit M.  While she apparently preferred home-schooling for Robert, she was aware that in doing so, she "shielded" him such that he "didn't learn the vast social complexities of life."  Exhibit I, p. 2.

Friends and family who knew Robert and Katie describe Robert's childhood in Exhibits J, K, L, M, and N.  Certainly, by all accounts, Katie provided proper medical care, food, and shelter for Robert.  The letters also describe Robert's development.  Greg Charland states that "as a young boy Robert needed to be carried by others" and that he did not learn to walk unassisted until his late teens.  Exhibit J.  Rev. Emily Preston comments that "Robert was largely schooled at home and so, in many ways, he is very naïve about the ways of the world."  Exhibit K.  Jane Silver and Mary Carnie describe Robert's positive attitude and his hard work as he tried to overcome his disabilities.  Exhibits L and N.

Donna Brewer writes in detail about her long acquaintance with Katie and Robert.  Exhibit M.  She got to know Katie because they were both foster parents living in Richmond.  *Id.*  She knew Robert throughout the time he lived with Katie.  *Id.*  Ms. Brewer writes that she knew

5

Robert would "have to work much harder than his peers" because of his cerebral palsy and other issues. *Id*. She describes his surgeries and how, through persistence, over many years, he went from crawling to eventually being able to walk short distances with his walker. *Id*. Ms. Brewer echoed Katie's admission that she shielded Robert from reality, saying, "he led a very sheltered, isolated, and protected life with his mother." *Id*. As an example, she reports the amazing fact that Robert "whole heartedly believed in Santa Claus until he was 22 years old." *Id*.

Unlike many young people, Robert was hardly ready to leave home at age 18. Katie reports that, despite his hard work, it took Robert until he was 22 years old to finally get his GED and to obtain a driver's license. Exhibit I. She states that he needed "2 years of direct one on one instruction in math specifically, for two hours a day, twice a week, and many additional hours of homework" before he finally passed the math portion of the GED test on his third try. Exhibit I, p. 2. Similarly, he had so much trouble learning to drive that his first driving instructor quit. After several years of special instruction in Vermont, Robert finally got a driver's license.

The limitations of Robert's cerebral palsy also persisted into adulthood. As an adult, his diagnosis remained "cerebal palsy of diplegic nature involving his trunk, pelvis, and bilateral lower extremities." Exhibit C, p. 1. Although he had made relative improvement in his mobility, his abilities remained severely limited. He also had major setbacks on occasion. There were "3 separate incidents where he lost his ability to ambulate independently including in his own home." *Id*. In those incidents it took from "several weeks to 2-3 months" for him to regain even his limited mobility. *Id*.

Notwithstanding Robert's physical and mental limitations, it appears that in recent years, Katie Brunk left Robert at home with her other foster children while she was at work in 2013 and 2014. Exhibit B, p. 1; Exhibit K, p. 2; PSR §57. It is also obvious that Katie provided Robert

with a computer at home and internet access. Thus, it was in this context that Robert committed the crime.

## THE CRIME ROBERT COMMITTED

There is no dispute that, at some point in 2013 and 2014, Robert downloaded child pornography from the internet and that he took photos of the 3 foster children in his home. Robert does not deny those facts.[3] However, that crime must be put in the context of his life history of extreme disability, medical traumas, intellectual limitations, social isolation, and all the struggles that came with those challenges. Robert did a reasonable job of explaining those circumstances himself in his description of the crime to David Cantagallo, the counselor who performed the psychosexual evaluation. Robert was candid and sadly conflicted in his explanation:

> I did not do it for malicious purposes or sexual gratification…. I did not have many normal friends, my only social stuff was on Sunday. I would see other children and some were younger than me. That was the extent of my social experience other than I hung out with children. My social group was 6 and 8 year olds… Emotionally I was already screwed up with pornography and I struggle with anxiety and depression and you can't be around child pornography and have it not affect you. I was home alone, I went on line to talk to people. I did not want to take the photos, I did not want to be mean …. I was not thinking about the impact…. I was very depressed. I did not want to sexually exploit these children…. I am not trying to deny or be in some subconscious state of denial, my emotional state was so screwed up and depressed, I don't know. I guess it is because what I told my mom was in my own self-searching. I spent too much time on child pornography I wish I had normal relationships like dating and stuff, I don't know…. My biggest regret, you can know, you can tell a toddler to not touch the stove, it was I did not know the impact, my biggest regret was that I did not know the emotional spiritual impact on the kids. I did not understand the impact of child pornography.

Robert's honesty with David Cantagallo was not a strategic decision made in an effort to obtain a better sentence. Rather, it was a continuation of the same honesty, and sad desperation,

---

[3] He does deny that he ever engaged in any other sexual conduct with the foster children or any other children.

he exhibited when the agents first came to his home. On November 7, 2014, law enforcement authorities executed an arrest warrant for Robert and a search warrant at his home. Chief Brendan Bosquet of Richmond described taking Mr. Brunk into custody. Specifically, he described how Robert became emotionally unstable, cried for his mother, and yelled, "I'm not a bad person," as he wept. Eventually, Chief Bosquet told Robert to sit down on the ground because he was so distraught. In the Chief's words:

> I arrived at [address redacted] in Richmond, NH to execute an arrest warrant on Robert Brunk. . . . . I announced that he was under arrest. Brunk then braced himself against the front door frame. I then took Brunk into custody, placing the handcuffs on his wrist hands facing forward due to his physical ability. I radioed the rest of the team members letting them know I had one in custody. Brunk started to yell "I'm not a bad person", "I want my Mom", and "where is my Mom," "I want my Mom". "I'm not a bad person". He started to cry. I advised him that we needed to go outside and escorted Brunk out of the house to the front lawn.
>
> I advised Brunk to sit on the ground because he was so distraught over being arrested. I was then assisted by other officers to help with the arrest. Brunk was on the ground and was searched for weapons or any contraband. No weapons were found on his person at the time he was arrested.

Robert was then transported to the Richmond Police Department where he was interviewed by Investigator Allison Vachon, of the New Hampshire Attorney General's Office, and Agent John Posthumus of Homeland Security. Investigator Vachon stated in her report that, "When I arrived at the location BRUNK was handcuffed, crying, and stating 'I'm not a bad person' over and over again." Investigator Vachon also reported that although Robert continued to weep, he waived his *Miranda* rights and proceeded to give a three-hour long confession. His confession included providing the agents passwords, without which they would not have been able to access his hard drives and obtain evidence of the crime he had committed.

Beyond his immediate honesty, there is even evidence that Robert was desperate and seeking help before his arrest. He had acknowledged his depression and loneliness. He knew

8

that he was in trouble.  Thus, in the month before he was arrested, he had begun to see a counselor, Phoebe Houghton. Exhibit D.  Unfortunately, he had not yet been able to bring himself to tell her about the child pornography because, as he explained to David Cantagallo, he was ashamed.  He said, "I did not want her to hate me" and "I was worried that my mother and others would hate me." Exhibit B, p. 2.

## GUIDELINES CALCULATION

The PSR reviews Robert's complete lack of criminal history, the facts of the offense, and certain guidelines, then states a total offense level of 35.  PSR §§28-46.  Insofar as that calculation, the defense objects to the application of USSG 2G2.1(b)(5) and to the 2-level increase because the minor victim was in the custody, care, or supervisory control of Robert. The defense acknowledges that under other circumstances, this provision allows a 2-level increase where the defendant had informal custody or supervision of a minor.  However, Katie Brunk's decision to leave minor foster children in the presence of Robert, who is afflicted with cerebral palsy and has a full scale IQ of 70, does not fall within the scope of this provision.  The provision properly covers those fully abled defendants who chose to abuse positions of trust and responsibility, whether formally or informally held.  This provision should not be applied against the oldest disabled child when a foster parent leaves disabled, adopted / foster children to fend for themselves while the parent is at work, regardless of her reasons or sympathetic circumstances.  In short, as wrong as Robert's conduct was, he did not abuse a position of trust. Rather, he was left in circumstances created by Katie and which were beyond his capacity.

Thus, while the PSR provides a total offense level of 35, the defense submits that the 2-level increase under USSG 2G2.1(b)(5) is improper.  The correct total offense level is 33.

THE DEFENSE REQUESTS A DEPARTURE, OR,
ALTERNATIVELY, A VARIANCE, TO ACHIEVE A SENTENCE
OF INCARCERATION OF 63 MONTHS

*Departure*

Robert's mental, emotional, and physical conditions, as detailed above, warrant a departure from the guidelines. USSG §5H1.3 provides that:

> Mental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines.

The Sentencing Commission changed this guideline in 2010. The guideline previously provided that mental conditions "are not ordinarily relevant in determining whether a departure is warranted." However, under the amended guideline, mental conditions are a valid basis for a departure if the terms of the §5H1.3 are met. Amendments Submitted to Congress April 29, 2010 (Effective November 1, 2010). Thus, this court has the discretion to grant a departure under this section. *United States v. Lee*, 790 F.3d 12, 19 (1st Cir. 2015).

Similarly, USSG §5H1.4 provides that:

> Physical condition or appearance, including physique, may be relevant in determining whether a departure is warranted, if the condition or appearance, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines. An extraordinary physical impairment may be a reason to depart downward; e.g., in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment.

Robert's circumstances fall squarely within both 5H1.3 and 5H1.4. Both departures are intended to apply when a defendant has one or more conditions which are unusual and which distinguish the defendant's case from the typical case covered by the guidelines. It is difficult to imagine a more unusual and atypical case than this case where the defendant has suffered a lifetime of debilitating physical and mental conditions. Surely, a premature birth, multiple major surgeries,

extensive scarring, cerebral palsy, a full scale IQ of 70, depression, and the other circumstances outlined above, qualify under these two provisions.

Considering that there are two strong bases for departure, the defense requests a departure of 7 levels, such that the total offense level is decreased from 33 to 26. At offense level 26, for a defendant like Robert with no criminal history, the guideline range is 63 to 78 months. The defense requests that the court impose the 63-month sentence, at the low end of that range.

*Variance*

If, as a result of disagreeing with the defense guideline calculation or denying the requested departure, the court does not agree that the total offense level should be 63 months, then the defense requests a variant sentence. A variance is warranted because of Robert's physical and mental conditions and the role those conditions played in the commission of this offense. A variance is also warranted because, notwithstanding the government's insistence otherwise, the guidelines for pornography cases are on such weak footing that they should be disregarded. Finally, a variance is warranted because the Bureau of Prisons is unlikely to have the resources to provide adequate medical care for Robert.

<u>The Mental Health Evidence Warrants a Variance</u>

Impaired mental functioning is "inherently mitigating," *see Tennard v. Dretke*, 542 U.S. 274, 285-88 (2004). Mental health conditions are so significant in the sentencing context that in death penalty cases consideration of mitigating mental health evidence is constitutionally required. *See Payne v. Tennessee*, 501 U.S. 808, 822 (1991). For the same reason, an attorney's failure to investigate and present mitigating mental health evidence constitutes ineffective assistance of counsel. *See Porter v. McCollum*, 130 S. Ct. 447 (2009) (relating to the defendant's post-traumatic stress disorder stemming from his military service in Korea).

The United States Supreme Court has expressly recognized that defendants afflicted by limitations like Robert's have diminished culpability.[4]

> "[C]linical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18. Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial. Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders. Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability.

*Atkins v. Virginia*, 536 U.S. 304, 318 (2002).

In the noncapital context, courts have recognized that a sentence of imprisonment for a defendant with a mental illness can be counterproductive to achieving the purposes of sentencing. *See United States v. Crespo-Rios,* 2015 U.S. Dist. LEXIS 144498, *13 (D.P.R. Oct. 19, 2015)(giving substantial consideration for the defendant's anxiety and depression as a sentencing factor in a child pornography case; collecting First Circuit district court cases); *see also United States v. Polito*, 215 Fed. App'x 354, 356 (5th Cir. 2007) *unpublished* (post-*Gall*, affirming a lower sentence in a child pornography case imposed in part because a term of imprisonment would interrupt the defendant's mental health treatment).

Robert's mental and physical limitations together warrant a variant sentence. As explained in *Atkins*, these conditions do not exempt him from criminal sanctions. Robert knows that and has accepted responsibility for his crimes. However, Robert's limitations do diminish his culpability such that the guidelines are not a fair measure of the appropriate sentence.

---

[4] The court refers to "mental retardation," a phrase no longer used and which the defense would not use except that it is contained in the opinion.

<u>The Guidelines for Pornography Cases Should Carry No Weight</u>

Contrary to what the government is likely to argue, the sentencing guidelines for child pornography are just as flawed in this case as in any other child pornography case.  As the court is surely aware, while other sentencing guidelines have been developed by the Sentencing Commission using an empirical approach based on past sentencing practices (and new research), *see Kimbrough v. United States*, 552 U.S. 85, 109 (2007); *Rita v. United States*, 551 U.S. 338, 349-50 (2007), the Commission did not use an empirical approach in formulating the guidelines for child pornography.  Instead, at the direction of Congress, the Sentencing Commission has amended the Guidelines under § 2G2.2 several times since their introduction in 1987, each time recommending harsher penalties.  *See* USSG. App. C, Amends. 537 & 538 (Nov. 1, 1996), 592 (Nov. 1, 2000), 615 (Nov. 1, 2001), 651 (Oct. 27, 2003), 664 (Nov. 1, 2006); *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010); *see*, *also United States v. Abraham*, 944 F. Supp. 2d 723, 727-31 (D. Neb. 2013) (setting forth a detailed criticism of this guideline); *United States v. Hanson*, 561 F. Supp.2d 1004, 1009 (E.D. Wis. 2008) (noting that, between 1994 and 2007, the mean sentence in child pornography cases increased from 36 months to 110 months as a result of "arbitrary increases by Congress slipped into other bills, often with little or no debate, resulting in direct amendments to the guidelines."); *United States v. Johnson*, 588 F. Supp.2d 997, 1003 (S.D. Iowa 2008) ("As far as this Court can tell, these modifications [to the child pornography guideline] do not appear to be based on any sort of empirical data, and the Court has been unable to locate any particular rationale for them beyond the general revulsion that is associated with child exploitation-related offenses.")  Even the Sentencing Commission has acknowledged that "[t]he frequent mandatory minimum legislation and specific directives to the Commission to amend the Guidelines make it difficult to gauge the effectiveness of any particular policy change,

or to disentangle the influences of the Commission from those of Congress." *See United States Sentencing Commission, Fifteen Years of Guidelines Sentencing*, at 73 (Nov. 2004)(available at http://www.ussc.gov/research-and-publications/research-projects-and-surveys/miscellaneous/fifteen-years-guidelines-sentencing ).

For these reasons, the court should give little weight to the guidelines sentence and should not hesitate to impose a variant sentence.

<u>There Is Reason to Believe that the Bureau of Prisons Cannot Provide Adequate Long-Term Care for Robert</u>

Finally, the defense asks the court to recognize that the Bureau of Prisons will likely struggle to meet Robert's medical needs. As noted above, his medical situation was challenging prior to this case. In the context of incarceration, Robert's medical care will surely be even more difficult. That difficulty will be multiplied by the recognized medical staffing issues of the Bureau of Prisons. A March 2016 report from the Office of the Inspector General, entitled "Review of the Federal Bureau of Prisons' Medical Staffing Challenges," explains that 73 of 97 federal prison facilities are medically understaffed. The report also states that "12 BOP institutions were medically staffed at only 71 percent or below, which the BOP's former Assistant Director for Health Services and Medical Director described as crisis level." *Id*. at p. i.

Robert's physical condition will decline if he does not get proper care for a long period of time. He will lose mobility and muscle function. Exhibit C, p. 2. In the most basic terms, this means that the time Robert serves behind bars will be more punitive than it would be for a healthy person. This is a valid and realistic concern which the defense asks the court to consider as a further basis for a variant sentence.

CONCLUSION

In many child pornography cases, the court has before it a middle-aged male with a healthy body, a normal IQ, a job, a family, friends, a social network, and, frankly, many reasons not to be drawn into the world of child pornography. Robert is not that defendant. Crippled by cerebral palsy, scarred by multiple surgeries, struggling with a borderline IQ and depression, Robert lived house-bound, with his adoptive mother and her other foster children, in Richmond, New Hampshire. He had no social life. He had no way to even learn how to engage with others, much less learn how to develop a normal sexual life. And, when he could get out of the house, he faced the reality of how many people in society react to someone like him.

It is no surprise that Robert found his way to the internet. Of course, there was probably no worse path for a person like Robert to travel when seeking social, and especially sexual, interaction. Yet, it is a readily available path in our society and the appeal it had for Robert is obvious. On the internet, Robert was invisible. On the internet, Robert was not disabled. On the internet, people responded to him. Yet, on the internet, what he found warped his thinking about acceptable, decent behavior. He was confused, desensitized, and misled by viewing child pornography, an effect which contributed directly to his criminal conduct.

By no means are these circumstances an excuse for Robert's conduct. However, this is not a simple situation. Robert chose to go in the wrong direction, but the reality is that circumstances beyond his control – life – gave him a pretty hard shove to get him started. Although he should not have succumbed and should have tried harder, his culpability is simply not the same as other defendants.

The guidelines sentence suggested by the PSR might be appropriate for some other defendant who committed this crime, but it is not appropriate for Robert. The defense suggests

that a sentence of 63 months incarceration and 10 years of supervised release is "sufficient, but not greater than necessary" to achieve the goals set forth in 18 U.S.C. 3553(a). Robert should not be, as suggested by his desperate mother, "put to death so he can find peace." PSR §59. Rather the court should recognize that the guidelines are meaningless in a case such as Robert's. As explained by David Cantagallo, with proper treatment, Robert will be less than a moderate risk to reoffend. Exhibit B, p. 15. A sentence of 5 years of incarceration, with treatment in prison, followed by 10 years of supervised release, is sufficient to get Robert to that point.

No further memorandum of law is submitted because all necessary citations and authorities are contained herein.

WHEREFORE, the defense requests that the court impose a sentence of 63 months of incarceration and 10 years of supervised release.

Date: August 23, 2016.                              Respectfully submitted,

/s/Richard Guerriero
N.H. Bar ID. 10530
Lothstein Guerriero, PLLC
Chamberlain Block Building
39 Central Square, Suite 202
Keene, NH 03431
Telephone: (603) 352-5000

CERTIFICATE OF SERVICE

I certify that this document, filed through the ECF system, will be sent electronically to the registered Participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as nonregistered participants on the date the document was signed by me.

/s/ Richard Guerriero